**WHOLE COURT**

**NOTICE: Motions for reconsideration must be**
***physically received*** **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**March 16, 2017**

# In the Court of Appeals of Georgia

A16A1633. FAIR et al. v. CV UNDERGROUND, LLC et al.

BRANCH, Judge.

After Mychal Fair was shot and killed on the premises of the Underground Atlanta shopping and entertainment district, his parents Michael Fair and Elizabeth Flynn ("appellants") brought this wrongful death action in the Superior Court of Fulton County against CV Underground, LLC, and Underground Management, LLC, (collectively, "Underground"), as the occupier of the property, and IPC International Corporation, which was under contract to provide security services. Michael Fair also asserted personal injury claims on behalf of the decedent's estate. In this Court, appellants argue that the trial court erred when it granted summary judgment to Underground and IPC because genuine questions of fact remain as to their responsibility for the decedent's death. We find no error and affirm.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law[.]" OCGA § 9-11-56 (c).

> Summary judgments enjoy no presumption of correctness on appeal, and an appellate court must satisfy itself de novo that the requirements of OCGA § 9-11-56 (c) have been met. In our de novo review of the grant [or denial] of a motion for summary judgment, we must view the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the nonmovant.

*Cowart v. Widener*, 287 Ga. 622, 624 (1) (a) (697 SE2d 779) (2010) (citation and punctuation omitted).

Although we view the record in the light most favorable to appellants, the relevant facts are not in dispute. On the afternoon of August 12, 2013, 23-year-old Fair was shopping at Underground Atlanta with a friend. At 3:47 p.m., surveillance video captured a brief altercation just inside the entrance from the fountains plaza to the indoor shopping area. The surveillance video, recorded at a low frame rate, shows Fair leaving through the glass doors, immediately followed by his friend. The video also shows the eventual shooter, Brandon Barnes, approaching, addressing, and walking beside a man in a blue-striped shirt; the two men looking out onto the

fountains plaza, where the victim had just gone; and walking back to and out of the bottom left of the frame.

Twenty seconds later, Fair's friend reenters the lobby and throws a fire extinguisher at three men who face him: a man in a red shirt, a man in a white shirt, and the man in the blue-striped shirt, with whom Barnes had previously communicated. Less than ten seconds after the fight begins, Fair can be seen throwing punches to the left of a floor-mounted sign in the lobby. As Fair continues fighting, Barnes moves from behind the floor-mounted sign to the front of the sign, where he watches the fight, gesturing as he does so. Barnes soon walks back behind the floor-mounted sign, but reemerges as the victim exits the lobby. Shortly afterward, the man in the white shirt and Barnes leave the lobby, walking out to the plaza one behind the other. Approximately 30 seconds later, judging from the alarm shown by onlookers, the shooting takes place out of view.

It is undisputed that Barnes shot Fair on the stairs leading from the fountains plaza to the street level above, although there is no direct evidence of precisely how much time elapsed between the time Fair and Barnes exited the indoor shopping area onto the fountains plaza and the shooting. There is no evidence regarding any interaction between Barnes and Fair after they exited the indoor shopping area, and

3

the record contains no eyewitness account of the shooting itself. No one from IPC's security staff was in the area inside the entrance during the fight, and no one was outside in the fountains plaza.

After a hearing, the trial court granted Underground's motion for summary judgment, based on its determination that, as a matter of law, Fair was a mutual combatant in the incident that caused him injury and, therefore, had knowledge of the danger that was superior to Underground's knowledge. In the same order, the trial court granted IPC's motion for summary judgment on the grounds that IPC did not owe Fair any duty as a third-party beneficiary to its contract with Underground and that there was no evidence that IPC committed any act that increased the risk of harm to Fair. This appeal followed.

1. Appellants contend that the trial court erred in granting Underground's motion for summary judgment because a question of fact remains as to whether Fair voluntarily entered into conflict with Barnes, and thus as to whether Fair had superior knowledge of any risk of harm posed by any of the fight's participants, including Barnes. We disagree.

Under Georgia law, an owner or occupier of land owes its invitees a duty "to exercise ordinary care in keeping the premises and approaches safe." OCGA § 51-3-1.

A proprietor is not the insurer of the safety of its invitees, but is bound to exercise ordinary care to protect its invitees from unreasonable risks of which it has superior knowledge. *Robinson v. Kroger Co.*, 268 Ga. 735, 740 (1) (493 SE2d 403) (1997); *Lau's Corp. v. Haskins*, 261 Ga. 491, 492 (1) (405 SE2d 474) (1991). Generally, an intervening criminal act by a third party insulates a proprietor from liability unless such criminal act was reasonably foreseeable. *Lau's Corp.*, 261 Ga. at 492 (1); see also *Six Flags Over Georgia II, L.P. v. Martin*, 335 Ga. App. 350, 360-361 (2) (a) (780 SE2d 796) (2015), cert. granted on other grounds, Case Nos. S16C0743 and S16C0750 (September 6, 2016).

"If [a] proprietor has reason to anticipate a criminal act," however, that proprietor "then has a duty to exercise ordinary care to guard against injury from dangerous characters." *Lau's Corp.*, 261 Ga. at 492 (1) (citation omitted); see also *Sturbridge Partners, Ltd. v. Walker*, 267 Ga. 785, 786 (482 SE2d 339) (1997). A plaintiff may establish that a criminal act was reasonably foreseeable on the part of the proprietor by showing the proprietor's knowledge of a pattern of prior "substantially similar" crimes on the premises "so that a reasonable person would take ordinary precautions to protect his or her [invitees] against the risks posed by that

5

type of activity." Id.; see also *Double View Ventures, LLC v. Polite*, 326 Ga. App. 555, 560-561 (1) (a) (757 SE2d 172) (2014).

"But even if an intervening criminal act may have been reasonably foreseeable, the true ground of liability is the *superior* knowledge of the proprietor of the existence of a condition that may subject the invitee to an unreasonable risk of harm." *Ratliff v. McDonald*, 326 Ga. App. 306, 313 (2) (a) (756 SE2d 569) (2014) (citation and punctuation omitted; emphasis in original); *Vega v. La Movida, Inc.*, 294 Ga. App. 311, 315 (2) (670 SE2d 116) (2008). Specifically, when a person is injured in the course of mutual combat, the combatants are deemed to have superior knowledge of the risk of harm, because "by their voluntary participation, [the combatants] have selected the time, date, and place for the altercation." *Sailors v. Esmail Intl., Inc.*, 217 Ga. App. 811, 813 (1) (1995); see also *Habersham Venture, Ltd. v. Breedlove*, 244 Ga. App. 407, 411 (4) (535 SE2d 788) (2000). "Mutual combat exists where there is a fight with dangerous or deadly weapons and when both parties are at fault and are willing to fight because of a sudden quarrel." (Citation omitted.) *Sailors*, 217 Ga. App. at 813 (1). In such a case, "[a]ny injuries to the combatants resulted from their own conduct[;] under such circumstances, the existence of prior criminal acts on the

6

premises is irrelevant and cannot form a basis for liability on the premises owner."
Id.

Here, Fair had already engaged in combat, and thus had knowledge superior to Underground's of *any* danger of retaliation by *any* of those persons participating *at any point* in the combat, including the shooter Barnes. Although appellants and the dissent would have it otherwise, nothing in our caselaw authorizes the reversal of summary judgment to a property owner on the grounds that a fighting plaintiff had no previous acquaintance with his attackers or was attacked by a person different from those who initiated the fight. Thus in *Rappenecker v. L. S. E., Inc.*, 236 Ga. App. 86 (510 SE2d 871) (1999) we held that even when a plaintiff who enters a fight is attacked by more than one person, he is held as a matter of law to have "knowledge superior to that of [the property owner] of the possible risk of additional trouble," Id. at 88 (2), including a second assailant who "joined in the ensuing criminal assault" and later pled guilty to aggravated battery. Id. at 87. Likewise, in *Fagan v. Atnalta, Inc.*, 189 Ga. App. 460 (376 SE2d 204) (1988), we affirmed a grant of summary judgment to a bar owner when a patron who intervened to protect a female bartender from a group of men being ejected from the bar was beaten by the same group of men as a result. Without making any distinction between the stages of the brawl inside and

7

outside the bar, we held that "an adult of ordinary intelligence will be held to be aware of manifest risk or danger of possible injury when he deliberately and voluntarily joins in an affray, as a matter of law." Id. at 461 (citations omitted); see also *Habersham*, 244 Ga. App. at 409, 411 (4) (reversing denial of summary judgment to a bar owner and its operator when the plaintiff "voluntarily chose to enter into mutual combat with the assailants", including not only the man the plaintiff hit with a baseball bat but also the man who stabbed the plaintiff in the back moments afterwards).

Further, as the trial court aptly noted, "a momentary pause in the fight does not alter the relative knowledge of the parties." Here, while the victim did exit the premises, he was immediately followed by the shooter and shot within 30 seconds. Thus in *Porter v. Urban Residential Dev. Corp.*, 294 Ga. App. 828 (670 SE2d 464) (2008), we affirmed a grant of summary judgment to a property owner when a plaintiff entered a fight with a group which eventually included not only his initial assailant, but also, after a pause in the conflict, that assailant's companions, who "ganged up on the decedent, who then sought to escape the confrontation." Id. at 832 (2). We applied the familiar rule that "[a]ny injuries to the combatants resulted from

8

their own conduct," rendering the subject of prior criminal acts on the premises "irrelevant." Id. (emphasis omitted).

In short, the undisputed facts here show that the decedent was "an active participant in a brawl that left him injured." *Sailors*, supra, 217 Ga. App. at 813 (1) (citation and punctuation). It follows that the trial court did not err when it granted summary judgment to Underground, which did not, as a matter of law, have knowledge equal to the decedent's as to the risks posed by this violent encounter. Id.; see also *Driver v. Leicht*, 215 Ga. App. 694, 695 (452 SE2d 165) (1994) (even if hosts were negligent and could be liable to an innocent bystander, they could not be liable to a guest who was an initiator or active participant in a brawl resulting in the guest's injury); *Ratliff*, supra, 326 Ga. App. at 313 (2) (a) (affirming grant of summary judgment when plaintiff had previously received threats from attacker, and thus had direct and "at least equal, if not a superior, knowledge" of the threat posed).[1]

2. Appellants also contend that Fair was a third-party beneficiary to IPC's contract with Underground to whom IPC owed a duty of care. Specifically, appellants contend that material issues of fact remain regarding whether IPC breached its duty

---

[1] In light of this discussion, we need not reach Underground's contention that no evidence showed that its failure to provide adequate security was the proximate cause of Fair's death.

9

to provide adequate security and, therefore, that the trial court erred in granting IPC's motion for summary judgment. Again, we disagree.

Under Georgia law,

> in personal injury cases, an injured party may not recover as a third-party beneficiary for failure to perform a duty imposed by a contract unless it is apparent from the language of the agreement that the contracting parties intended to confer a direct benefit upon the plaintiff to protect him from physical injury.

(Citation and punctuation omitted.) *Anderson v. Atlanta Committee for Olympic Games*, 273 Ga. 113, 117 (4) (537 SE2d 345) (2000). See also OCGA § 9-2-20 (b) (authorizing actions by third-party beneficiaries).

> Although the third-party beneficiary need not be specifically named in the contract, the contracting parties' intention to benefit the third party must be shown on the face of the contract. The mere fact that the third party would benefit from performance of the agreement is not alone sufficient. We recognize that whenever a premises owner contracts with a private security company the parties may expect the security services provided to benefit invitees who visit the property. As we have held, however, an injured invitee may not recover against the security company for negligent performance if the contract is silent as to the parties' *intent* to confer that benefit.

10

(Citations and punctuation omitted; emphasis in original.) *Brown v. All-Tech Investment Group*, 265 Ga. App. 889, 897 (2) (a) (i) (595 SE2d 517) (2003). See also *Anderson*, 273 Ga. at 117-118 (4); *Armor Elevator Co. v. Hinton*, 213 Ga. App. 27, 30 (2) (443 SE2d 670) (1994) ("[I]n personal injury cases, an injured party may not recover as a third-party beneficiary for failure to perform a duty imposed by a contract unless it is apparent from the language of the agreement that the contracting parties intended to confer a direct benefit upon the plaintiff to protect him from physical injury.") (citations and punctuation omitted).

In this case, the service contract provides that IPC agreed, as an independent contractor "to provide . . . Interior/Exterior Security" and "on-site security and public safety services" for the Underground Atlanta property according to a specified manpower schedule. The contract does not mention "patrons," "customers," "shoppers," "visitors," or any other term that describes Underground's invitees Thus we conclude that the general descriptor "public safety services," which designates the type of services to be provided under the contract, does not show a clear intent to confer a direct benefit to patrons of Underground. Accordingly, the trial court did not err in ruling that IPC did not owe Fair any duty as a third-party beneficiary to IPC's

11

contract with Underground. *Anderson*, supra, 273 Ga. at 117-118 (4); *Brown*, supra, 265 Ga. App. at 897 (2) (a) (i); *Armor Elevator Co.*, supra, 213 Ga. App. at 30 (2).

3. Appellants contend, in the alternative, that IPC undertook an extra-contractual duty to protect members of the public and, through its conduct, increased the risk of harm to Fair and, therefore, that the trial court erred in granting IPC's motion for summary judgment, citing Restatement (Second) of Torts, Section

As the Supreme Court of Georgia has explained, however,

> Section 324A (a) applies only to the extent that the alleged negligence of the defendant exposes the injured person to a greater risk of harm than had existed previously. Accordingly, Section 324A (a) applies when a nonhazardous condition is made hazardous through the negligence of a person who changed its condition or caused it to be changed. Liability does not attach for failing to decrease the risk of harm. Put another way, the mere failure to abate a hazardous condition – without making it worse – does not trigger the application of Section 324A (a).

*Herrington v. Gaulden*, 294 Ga. 285, 288 (751 SE2d 813) (2013) (citations and punctuation omitted.) . Regardless whether IPC's performance may have allowed a hazardous condition to continue and failed to make Underground's patrons any safer, the appellants have not even alleged that a nonhazardous condition existed at

12

Underground that was made into a hazardous condition through any acts or omissions on the part of IPC. Accordingly, appellants' argument based on subsection (a) of Section 324A of the Restatement lacks merit. *Herrington*, 294 Ga. at 288; see also *BP Exploration & Oil, Inc. v. Jones*, 252 Ga. App. 824, 830 (2) (a) (558 SE2d 398) (2001) (physical precedent only). Moreover, the appellants do not allege that IPC's performance was to be substituted completely for that of the party on whose behalf the undertaking is carried out, that is, Underground; nor do they contend that Fair actually relied on IPC's undertaking, and, therefore, subsections (b) and (c) of Section 324A do not apply. *BP Exploration*, 252 Ga. App. at 830-832 (2) (b), (c).

For all these reasons, the trial court did not err when it granted summary judgment to both Underground and IPC.

*Judgment affirmed. Doyle, C. J., Dillard, P. J., Andrews, Ray, Mercier and Bethel, JJ., concur. Ellington, P. J., and Reese, J., concur in part and dissent in part.*

13

A16A1633. FAIR et al. v. CV UNDERGROUND, LLC et al.

ELLINGTON, Presiding Judge, concurring in part and dissenting in part.

I concur in Divisions 2 and 3. Because the evidence of record does not establish as a matter of law that Fair was injured as the result of mutual combat, however, a jury question remains regarding whether CV Underground, LLC, and Underground Management, LLC (collectively, "Underground"), as the occupiers of the property where Fair was shot, are liable for his death. Accordingly, I dissent to Division 1.

In a small subset of premises liability cases where the plaintiff claims that he was injured as a result of the owner/occupier's failure to provide adequate security on the property to prevent third-party criminal attacks, Georgia courts have recognized a "mutual combat" defense. In these cases, our courts have held that those who engage in mutual combat are deemed to have knowledge of the risk of harm they might suffer from their own conduct that is superior to the knowledge of the risk that

the owner/occupier may have based on prior criminal attacks on the property.[1] Thus, one who deliberately interjects himself into an affray assumes the risk of injury from the brawl.[2] In such a case, "the existence of prior criminal acts on the premises is irrelevant and cannot form a basis for liability on the premises owner." *Sailors v. Esmail Intl., Inc.*, 217 Ga. App. 811, 813 (1) (459 SE2d 465) (1995). Although, as the trial court noted, and the majority agrees, a momentary pause in a fight would not alter the relative knowledge of parties who engaged in mutual combat, it is clear that the mutual combat defense applies only when there is *a causal connection* between a fight and the plaintiff's injury.[3]

---

[1] *Cornelius v. Morris Brown College*, 299 Ga. App. 83, 86 (3) (681 SE2d 730) (2009); *Habersham Venture, Ltd. v. Breedlove*, 244 Ga. App. 407, 410 (4) (535 SE2d 788) (2000); *Sailors v. Esmail Intl., Inc.*, 217 Ga. App. 811, 813 (1) (459 SE2d 465) (1995); *Driver v. Leicht*, 215 Ga. App. 694, 695 (452 SE2d 165) (1994).

[2] *Cornelius v. Morris Brown College*, 299 Ga. App. at 86 (3); *Sailors v. Esmail Intl., Inc.*, 217 Ga. App. at 813 (1); *Driver v. Leicht*, 215 Ga. App. at 695.

[3] See *Porter v. Urban Residential Dev. Corp.*, 294 Ga. App. 828, 832- (2) (670 SE2d 464) (2008) (injuries resulting from the decedent's "active, voluntary participa[tion] in the fight's commencement and its continuation"); *Sailors v. Esmail Intl.*, 217 Ga. App. at 813 (injuries to combatants "result[ing] from their own conduct[,]" that is, "their voluntary participation in" an altercation); *Driver v. Leicht*, 215 Ga. App. at 695 (injuries resulting from a person's active participation in a brawl).

2

In this case, however, contrary to the conclusion in the majority opinion, the evidence does not establish the requisite causal connection as a matter of law. Given the paucity of evidence, reasonable minds can differ regarding whether Fair's injuries resulted from the mutual combat he voluntarily participated in. Since Fair, the injured party, died at the scene, there is of course no statement from him about the circumstances surrounding the fight. The record contains no statement from Brandon Barnes, the person who injured Fair, about his reason for shooting Fair, whether he had any quarrel with him, or whether he even knew the combatants depicted in the surveillance video. There is no statement from Fair's friend, who threw the fire extinguisher, about the circumstances surrounding the fight. The men who engaged in the fight, other than Fair, are not identified by name in the record and provided no evidence that connects Barnes to the altercation. The testimony of Walter Gilbert, the sole eyewitness to the fight who gave evidence, contained nothing that connected Barnes to the altercation.[4] In short, the *only* evidence relating to the question whether

---

[4] Gilbert, who operates an outdoor attraction near the entrance where the fight occurred, viewed the video and testified that he was the man in the green shirt, that he saw the fight and went inside to try to break it up, and that he saw four young men fighting. After Fair walked out into the fountains plaza, Gilbert heard the shots, looked out, and saw Fair fall.

Fair's injuries arose from the fight among Fair and the other men is the surveillance video, and that evidence is equivocal at best.

As the majority's description of the images depicted in the video indicates, the video shows that before the fight Barnes was in the area where the fight occurred, just inside the glass doors leading to the fountains plaza, that he exchanged a few words with one of the combatants (the man in the blue-striped shirt), that he observed the fight, just as Walter Gilbert and multiple other bystanders did,[5] and that he exited the building just after one of the combatants (the man in the white shirt). After viewing the video, a jury could conceivably infer (as the appellees, the trial court, and the majority have inferred) that Barnes, the man in the blue-striped shirt, the man in the red shirt, and the man in the white shirt were all companions together, and that, even if the video did not capture Barnes' physical involvement in the fight inside the shopping area, his shooting of Fair outside flowed directly out of the fight that Fair willingly engaged in. But the video is also consistent with a scenario in which Barnes

_____

[5] The majority described Barnes as "gesturing" while he watched the fight. As I see it, the gesture, which consisted of him extending his left arm to the side, does little, if anything, to indicate he was a participant in the altercation.

4

was completely unacquainted with any of the combatants, merely observed the fight, and, for reasons unconnected to the fight, decided to shoot Fair.[6]

Although the surveillance video shows that Barnes very briefly walked beside and apparently spoke a few words to one of the combatants, and that he later exited the building just after another one of the combatants, the timeline and the images on the video, *standing alone*, do not establish anything more than a temporal connection between the combat and the homicide. Such evidence cannot establish as a matter of law even that Barnes was acquainted with those combatants, much less that he shot Fair as some continuation of their fight with Fair and his friend. Yet the majority finds as a matter of law that Barnes participated in the fight, despite the absence of competent evidence of that fact, and from that finds that the combat was causally related to Fair's death.[7] Although the video shows that Fair engaged in mutual combat

---

[6] Although Underground labels the man in the blue-striped shirt, the man in the white shirt, and the man in the red shirt as Barnes's "friends," there is no evidence in the record to support this characterization, apart from Underground's subjective interpretation of the video.

[7] By contrast, the cases cited in the majority opinion contained direct evidence of the circumstances of the altercation in the testimony of the plaintiff or eyewitnesses. See, e.g., *Rappenecker v. L.S.E., Inc.*, 236 Ga. App. 86 (510 SE2d 871) (1999) (The plaintiff was injured following an argument with another man, when the man attacked him as he tried to walk away and then another man joined in the assault, as described by multiple eyewitnesses.); *Fagan v. Atnalta, Inc.*, 189 Ga. App. 460

on the premises, it is clear that the majority can only find as a matter of law that Fair's injuries resulted from the brawl by drawing inferences to favor the movants (the appellees). Regardless whether the appellees' interpretation of the video may seem more likely to the trial court, or to members of this Court, our Constitution reserves to the jury the power of finding facts from inconclusive evidence, and the law does not permit judges to usurp that power. *McCurry v. Bailey*, 224 Ga. 318, 320 (1) (162 SE2d 9) (1968); *Collins v. Newman Machine Co.*, 190 Ga. App. 879, 884 (3) (380 SE2d 314) (1989). When the evidence that was presented to the trial court in support of the appellees' motions for summary judgment is viewed *in the light most favorable to the nonmovants* (the appellants), as required, I conclude that there remains a genuine issue as to whether Fair's death resulted from his voluntary participation in mutual combat.[8] Because a jury question remains regarding the proximate cause of

_____

(376 SE2d 204) (1988) (The plaintiff personally testified that he knew he might be hurt if he intervened in a developing altercation involving bar employees and belligerent customers who were being ejected, and one of the bartenders also testified about the plaintiff's intervention and resulting injuries.).

[8] The majority misconstrues my position. I do not propose reversing the grant of summary judgment because there is no evidence that Fair had previous acquaintance with Barnes or because there is no evidence that Barnes was the person who initiated the fight. Rather, because the evidence does not establish as a matter of law that Barnes participated at any point in the combat, it is not undisputed that Fair's death resulted from his participation in combat, which precludes summary judgment on that basis.

Fair's death, the trial court erred in granting Underground's motion for summary judgment based on the mutual combat defense.[9]

---

[9] See *Six Flags Over Georgia II, L.P. v. Martin*, 335 Ga. App. 350, 360-361 (2) (a) (780 SE2d 796) (2015) (accord), cert. granted on other grounds, Case Nos. S16C0743 and S16C0750 (September 6, 2016)(Evidence that included a history of gang activity inside the defendant theme park and numerous assaults that began on the premises, particularly at closing time, and spilled over to areas surrounding the park raised issue of material fact as to whether the proprietor's lack of adequate security around the adjacent bus stop was the proximate cause of a park visitor's injuries from an attack at the bus stop.); *Double View Ventures, LLC v. Polite*, 326 Ga. App. at 560-561 (1) (a) (Evidence of numerous armed robberies and assaults inside a convenience store and a high crime rate in the surrounding area raised an issue of material fact as to whether the proprietor's lack of adequate security and failure to maintain its fence was the proximate cause of a customer's injuries from an attack at the edge of the property.); *McNeal v. Days Inn of America, Inc.*, 230 Ga. App. 786, 787-788 (498 SE2d 294) (1998) (Evidence of several criminal acts in a hotel's parking lot, including a violent melee that spilled over from a nearby housing project, raised an issue of material fact as to whether a hotel's lack of adequate security was the proximate cause of a guest's injuries from an attack in the parking lot.); *Killebrew v. Sun Trust Banks, Inc.*, 221 Ga. App. 679, 680 (1) (472 SE2d 504) (1996) (Because "[t]he dangers of ATMs are well known and undeniable[,]" case presented a material question regarding whether a bank's inadequate parking lot security was the proximate cause of a customer's injuries from an attack at an ATM.) (physical precedent only); *Matt v. Days Inns of America, Inc.*, 212 Ga. App. 792, 793-796 (443 SE2d 290) (1994), aff'd, 265 Ga. 235 (454 SE2d 507) (1995) (Evidence of frequent criminal incidents on a hotel's premises, and of serious violent crimes in the parking lots of nearby hotels, raised an issue of material fact as to whether a hotel's lack of adequate security was the proximate cause of a guest's injuries from an attempted armed robbery in the hotel's parking lot.); *Confetti Atlanta, Ltd. v. Gray*, 202 Ga. App. at 243-244 (1) (Evidence of prior fights inside and outside a night club raised an issue of material fact as to whether the club's lack of adequate security after closing while customers remained in the parking lot was the proximate cause of a customer's injuries from a fight in the parking lot.).

Moreover, this is not a case where the grant of summary judgment may be affirmed as having been right for a reason the trial court chose not to address.[10]

Accordingly, I dissent to Division 1.

I am authorized to state that Judge Reese joins me in this opinion.

---

[10] See *Georgia-Pacific, LLC v. Fields*, 293 Ga. 499, 503-504 (2) (748 SE2d 407) (2013) ("A grant of summary judgment must be affirmed if it is right for any reason, whether stated or unstated in the trial court's order, so long as the movant raised the issue in the trial court and the nonmovant had a fair opportunity to respond." The non-movant is not required, however, to produce any counter evidence or materials in affirmative support of its side of an issue that the movant did not urge as a reason for entry of summary judgment, and it is error for an appellate court to affirm a grant of summary judgment on such a basis.) (citations and emphasis omitted); *City of Gainesville v. Dodd*, 275 Ga. 834, 839 (573 SE2d 369) (2002) (The appellate court correctly applied the "erroneous legal theory" exception to the "right for any reason" rule and refused to address grounds for summary judgment which the trial court had not ruled upon and which all parties had not properly briefed on appeal.). Notably, Underground did not argue that it was entitled to summary judgment on the basis that there was no evidence that there had been prior substantially similar crimes on the premises creating a known dangerous condition, and the trial court did not reach this issue in its summary judgment ruling. The appellants argued that Underground opted not to raise this argument "because everybody knows that Underground Atlanta is a cesspool" and that there was evidence, known to Underground, of a large number of previous willful killings, armed robberies, and other violent crimes on the Underground premises and in the surrounding vicinity. Both Underground Management's general manager, William Ciccaglione, and two public safety directors for IPC, Patrick Salmon and Robert Reid, were aware of two prior murders at Underground from 2008 to the time of Fair's death. The business owner, Walter Gilbert, testified that he has seen many fights at Underground and described the fountains plaza as a "hot area." In addition, Salmon testified that Fair's assailant, Barnes, had previously been banned from the property.

8